**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**Eastern Division**

William M. Lyons, *et al.*

                          Plaintiffs,

    v.

City of Columbus, *et al.*,

                          Defendants.

Case No. 2:20-cv-3070

Judge James l. Graham

Magistrate Judge Elizabeth A. Preston Deavers

\*          \*          \*          \*          \*

**PLAINTIFFS' ANSWER TO DEFENDANTS' MOTION TO DISMISS**

Now come Plaintiffs William Lyons, *et al.* ("Plaintiffs" or "Petitioners Committee"), by and through counsel, and answer the Motion to Dismiss by Defendants City of Columbus *et al.* ("the City") (ECF No. 13 (hereinafter "City's MTD")).[1]

---

[1] Plaintiffs apologize to the Court for the delay in this brief, even though that delay received court approval. By way of explanation for this delay, the parties had consented to multiple extensions of time due to the June 16, 2020, Emergency Application to Vacate Stay filed before the U.S. Supreme Court asking the Court to vacate *Thompson v. DeWine*, 959 F.3d 804 (6th Cir. 2020). The parties had been consulting the Court's docket, at https://www.supremecourt.gov/search.aspx?filename=/docket/docketfiles/html/public/19a1054.html, which had not been updated with the Court's June 25 Order denying the Emergency Application to Vacate. (Docket archived as of Feb. 23, 2021, at https://web.archive.org/web/20210223133159/https://www.supremecourt.gov/search.aspx?filename=%2Fdocket%2Fdocketfiles%2Fhtml%2Fpublic%2F19a1054.html.) Plaintiffs had assumed the Court docket to be the definitive source of that case's status, and had no intent to unduly delay the proceeding here.

**Table of Contents**

I. Summary..............................................................................................................................3

II. Facts..................................................................................................................................4

    A. The process for amending the City Charter....................................................................4

    B. The Columbus Community Bill of Rights Charter amendment petition and signature
    gathering plan....................................................................................................................5

    C. COVID-19 and Ohio's Response..................................................................................7

    D. Columbus Community Bill of Rights' decision to prioritize public health and suspend
    signature gathering............................................................................................................9

    E. City of Columbus Council's refusal to take action under these exceptional
    circumstances..................................................................................................................10

    F. City of Columbus' Health Commissioner's refusal to take action under these exceptional
    circumstances..................................................................................................................11

III. Petitioners Committee has stated a claim upon which the Court can grant relief...............12

    A. The people's power to petition for a proposed charter amendment is constitutionally
    protected, and regulations on that process cannot be unduly restrictive..............................13

    B. Insurmountable scrutiny applies here because the one-year deadline infringes on core
    political speech in petition circulation................................................................................14

    C. Anderson-Burdick's multiple standards for assessing ballot access violations...............15

    D. The Columbus City Charter's one-year deadline is state action that infringes on
    Plaintiffs' ballot access, regardless of whether the State of Ohio pandemic orders limited
    petition circulation...........................................................................................................19

    E. The facts of this case are more analogous to *Esshaki* and *SawariMedia* than to
    *Thompson*.....................................................................................................................20

    F. Columbus' one-year deadline is a severe burden to ballot access under these pandemic
    conditions.......................................................................................................................23

    G. Even if the Columbus City Charter deadline on signature gathering, when applied
    during this pandemic, is a less-than-severe burden, the City's interests here do not
    outweigh Petitioners Committee's right to ballot access....................................................25

        1. The City's interests in imposing the one-year deadline are insignificant, and balanced
        against Petitioners Committee's ballot access right, weigh in favor of the Petitioners
        Committee..................................................................................................................28

IV. Petitioners Committee have stated a claim upon which relief can be granted....................35

V. Conclusion........................................................................................................................37

Certificate of Service............................................................................................................38

## I.       Summary

Plaintiffs are members of the committee of petitioners coordinating signature gathering for the Columbus Community Bill of Rights, a proposed amendment to the City of Columbus City Charter. In the spring of 2020, Plaintiffs suspended their signature gathering campaign in order to do their part to stop the spread of COVID-19. But the City Charter, in section 42-7, provides a deadline for turning in gathered signatures, and as the City concluded it was unable to waive this constitutional requirement, the Plaintiffs brought this action to seek relief from the signature petition deadline.

Under the unique circumstances of the COVID pandemic, the City Charter deadline is a severe burden on ballot access as prohibited by the United States Constitution. The First Amendment prohibits severe burdens on ballot access that are not narrowly tailored to serve a compelling government interest. Here, the one-year deadline is a severe burden on ballot access because it prevents Plaintiffs from accessing the ballot – gathering signatures during the last three months of their campaign would have put lives at risk. Strict scrutiny should apply here under either *Anderson-Burdick*'s ballot access analysis, following *Esshaki v. Whitmer*, 813 Fed. Appx. 170 (6th Cir. 2020) and *SawariMedia LLC v. Whitmer*, 963 F.3d 595 (6th Cir. 2020), or under *Meyer v. Grant*, 486 U.S. 414 (1988), for violating political rights during signature gathering. (*See infra*, pages 13 to 25.)

Even if the Court instead follows the reasoning of *Thompson v. DeWine*, 959 F.3d 804 (6th Cir. 2020) and 976 F.3d 610 (6th Cir. 2020), the Court must still apply an intermediate scrutiny test balancing the infringement on ballot access against the legitimate interests of the City in imposing its one-year petition deadline during the COVID pandemic against a petition that was on track to qualify with 98 days of signature gathering remaining. *Thompson* held that Ohio's stay-at-home orders did not infringe on the initiative process. Here, Plaintiffs seek relief

3

from a City Charter section that is unconstitutional during this pandemic – a one-year deadline to turn in petitions that is unique in the cities of Ohio. The City fails to provide legitimate interests that are protected by the one-year deadline, and so even under the *Thompson* review standard, the Court should deny the City's motion to dismiss. (*See infra*, pages 25 to 37.)

Petitioners merely wish to preserve their signature gathering efforts to this point so that they can resume signature gathering when it can be safely done. This suggested remedy is discussed in pages 34 to 37. This case is not moot as it was never connected to a particular election, and but-for Columbus City Charter section 42-7, the Petitioners Committee could resume signature gathering post-pandemic.

## II. Facts

### A. The process for amending the City Charter

Columbus City Charter provides that either the people by petition, or the council by two-thirds vote, may submit proposed amendments to the Charter to the electors of the city for approval. Charter section 45.[2]

To initiate the charter amendment petition process, a petition committee (Sec. 42-3) uses the City Clerk's template petition (Sec. 42-1) to create a petition form (Sec. 42-2) and files a certified copy of the petition with the City Clerk (Sec. 42-4). The date of the certified copy filing triggers a one-year deadline for signature gathering, which is the provision Plaintiffs are challenging in this case, as applied during this pandemic:

Sec. 42-7. - All petitions to be filed with city clerk.

---

2   https://library.municode.com/oh/columbus/codes/code_of_ordinances?nodeId=CHTR_THECICOOH_CHAM_S45CHAM

All separate part-petitions providing for a proposed ordinance, referendum, recall, or charter amendment shall be filed at the same time, as one instrument, with the city clerk. No alterations, corrections, or additions may be made to a petition after it is filed in a public office. Petitions for an initiated ordinance or charter amendment shall be filed within one year of filing a certified copy of the same with the city clerk; petitions for recall or referendum shall be filed as otherwise provided for herein.

The one-year deadline was added in a 2014 amendment to the Charter. To Plaintiffs' knowledge, this deadline is unique among the petition processes in Ohio's cities.

After the petition committee files the signed petitions with the City Clerk, the Clerk forwards the petitions to the three County Boards of Elections that administer elections within the City of Columbus to validate the signatures, and to the City Attorney to review the legal sufficiency of the petition. (Sec. 42-9.) If the petition and signatures meet legal requirements, the City Council must pass an ordinance to put the measure on the ballot. (Secs. 45-1, 45-2, 42-11, 42-1.2) The Council must take action "forthwith," but the particular timing of the ordinance is important, as it determines on which electoral ballot the proposed charter amendment appears:

Sec. 45-2. - Placement of issue on the ballot.

The aforesaid ordinance shall order and provide for the submission of such proposed charter amendment to the electors at the next regular municipal election if one shall occur not less than sixty nor more than one-hundred-twenty days after its passage; otherwise it shall provide for the submission of the question at a special election to be called and held within the time aforesaid.

If the majority of the electors approve the proposed Charter amendment, it becomes part of the City Charter. (Sec. 45-5.)

**B.      The Columbus Community Bill of Rights Charter amendment petition and signature gathering plan**

In a previous initiative effort to put a proposed City ordinance on the ballot, Plaintiffs had successfully gathered over 18,000 signatures (Lyons Decl. Para. 4), but were kept off the ballot

by the Board of Elections and the courts. *See State ex rel. Bolzenius v. Franklin Cnty. Bd. of Elections*, 2018-Ohio-3708.[3]

For the proposed Charter amendment at issue here, the Petitioners Committee for the proposed Charter amendment "Community Bill of Rights for Water, Air, and Soil Protection and to Prohibit Fossil Fuel Extraction and Related Activities and Projects" (hereinafter "Community Bill of Rights" or "proposed Charter amendment"), filed a certified copy of the petition with the City Clerk on June 19, 2019. (Lyons Decl. para. 3.)

By March 11, 2020, the campaign had secured almost 9,000 signatures to place the Charter Amendment on the November 2020 ballot. (Lyons Decl. para. 4.) Petitions always contain many invalid signatures (from, *e.g.*, voters who mistakenly sign but do not actually live in the city), and thus petitioners intended to gather upwards of 50% more signatures than required. The petitions require 9,870 valid signatures. The campaign collected over 18,000 signatures last time. This time they planned to turn in at least 16,000 total signatures to exceed the required 9,870 valid signatures. (*Id.*) Plaintiff Lyons observed that "we were confident that we would have made it given all the events that were going to happen. We always get a big push at the end when warmer weather comes." (*Id.*)

Plaintiffs and the campaign planned to gather signatures at a number of events in March, April, May, and June. (Lyons Decl. para. 8.) Based on their recent successful signature gathering effort, they were confident that this plan would result in sufficient signatures to qualify the proposed Charter amendment. In addition to the 21 major community events Plaintiffs and the campaign planned to canvass, they have regularly collected hundreds of signatures in front of the Columbus libraries. They also collect signatures when invited to church services, when church

---

3   Opinion and docket available at http://www.sc.ohio.gov/Clerk/ecms/#/caseinfo/2018/1221.

ministers of the African American community and others have allowed them to speak to their

congregations and collect signatures. (*See* Lyons Decl. Para. 9.) The Plaintiffs also subscribe to

weekly newsletters of upcoming meetings and events where they look to petition. (*Id.*)

### C.      COVID-19 and Ohio's Response

On March 3, 2020, Governor DeWine announced that the Arnold Sports Festival, a large

gathering of athletes and spectators in downtown Columbus, Ohio, was closed to spectators. On

March 9, he declared a state of emergency in Ohio. On March 9, the Ohio State University

suspended classes. On March 12, Governor DeWine and Dr. Amy Acton, Director of the Ohio

Department of Health, ordered mandatory emergency closings throughout Ohio. On March 12,

Governor DeWine ordered all private and public schools closed after March 16. On March 13,

the Columbus Metropolitan Library closed its branches. Parades and events were canceled

throughout Central Ohio at this same time, including the Columbus International Auto Show in

Columbus, Ohio, and St. Patrick's Day parades in Columbus and Dublin.

On March 14, 2020, the Ohio Department of Health issued "Director's Order: In re:

Order to Limit and/or Prohibit Mass Gatherings in the State of Ohio."[4] On March 15, 2020, the

Ohio Department of Health issued "Director's Order: In re: Order Limiting the Sale of Food and

Beverages, Liquor, Beer and Wine to Carry-out and Delivery Only." Early on March 17, 2020,

the Ohio Department of Health issued "Director's Order: In re: Closure of Polling Locations in

the State of Ohio on Tuesday, March 17, 2020." On March 17, 2020, the Ohio Department of

Health issued "Director's Order: In re: Amended Order to Limit and/or Prohibit Mass Gatherings

and the Closure of Venues in the State of Ohio." On March 22, 2020, the Ohio Department of

---

4   Public Health Orders from Department of Health and Governor DeWine are available at
    https://coronavirus.ohio.gov/wps/portal/gov/covid-19/resources/public-health-orders/Public-Health-Orders.

Health issued "Director's Order that All Persons Stay at Home Unless Engaged in Essential Work or Activity."

On March 13, 2020, the President of the United States declared a national emergency retroactive to March 1, 2020.

Through 2020, Ohio and most states attempted to re-open, only to find their COVID case rates spiking a couple weeks later due to the increased social contacts caused by the re-opening. Ohio's infection "waves" each dwarfed the previous one, leading to a massive spike in infections over the winter of 2020-2021. As the following graph shows, by mid-June 2020 Ohio had been issuing re-opening orders for a solid month. But after trying to re-open in early autumn, the pandemic surged into winter:



Ohio confirmed cases graph from https://coronavirus.jhu.edu/data/state-timeline/new-confirmed-cases/ohio/51 on Feb. 23, 2021.

In a May 29, 2020 order, Dr. Acton, Director of the Ohio Department of Health, expressly emphasized that taking proactive steps above and beyond the government health orders "will benefit everyone"[5]:

> [I]f the situation deteriorates [then] additional targeted restrictions will need to be made. While government can set the baseline, it should be understood that these orders set forth the minimum acts that must be taken and if people do more than the minimum to act safely, it will benefit everyone.

**D.      Columbus Community Bill of Rights' decision to prioritize public health and suspend signature gathering.**

On March 12, 2020, Plaintiffs and the campaign, decided to stop gathering signatures due to the pandemic. On March 14 they announced by email the suspension of signature gathering to their volunteer petitioners. (Lyons Decl. Para. 7.)

Signature gathering is usually highly productive at large public gatherings. For example, signature gathering outside the March primary election polling places, which was scheduled for March 17, is very effective because the people present are all registered voters who reside in the city. Other large public gatherings are more common in the late spring and early summer, not in the winter.

Because of the arrival of the first wave of the COVID-19 pandemic in Ohio, these events were all canceled by state public health orders.

---

5      Available at https://coronavirus.ohio.gov/static/publicorders/revised-business-guidance-sd.pdf in preamble.

**E.     City of Columbus Council's refusal to take action under these exceptional circumstances.**

On April 27, 2020, Plaintiffs requested, given the extraordinary circumstances, that the

Columbus City Council could simply use its power under Charter section 45 to place the

initiative on the ballot by a two-thirds vote.

In response Columbus City Council President Shannon Hardin's legislative aide wrote to

Plaintiff Sandy Bolzenius on May 1, 2020 (Bolzenius Decl.):

> Dear Sandy Bolzenius and the Community Bill of Rights team,
>
> Thanks for your email. I hope you all and your loved ones are safe during this trying time.
>
> It would be an unprecedented action to shift a citizen-initiated petition, that has not met the signature threshold, to a Council-initiated charter change. Residents approved the Charter measures that set forward the petition process. By unilaterally placing this amendment on the ballot, Council would be circumventing the process approved by voters. Council President Hardin does not support Council unilaterally placing the Community Bill of Rights on the ballot this November. Council is committed to following the charter. When the CCBOR team gathered the adequate signatures in 2018 and followed the process as articulated in the Charter, Council moved to place that proposed ordinance on the ballot.
>
> This all being said, we are sorry that COVID-19 blocked the legally-allowed path you all were pursuing to put this question before voters. Our office sees you all at community events all over town. The CCBOR team works extremely hard for what you believe in and your commitment to this effort is unquestionable.
>
> Thank you for taking the time to read this and have a great day.
>
> Best,
>
> Zak Davidson
>
> Legislative Aide | Office of Columbus City Council President Shannon G. Hardin

On May 14, Defendant Council President Pro Tempore Elizabeth Brown responded to

campaign volunteer Carolyn Harding's email. (Harding Decl.) The elected official expressed her

disagreement with the strategy of attempting to regulate fracking through city law. This policy

debate shows why the U.S. Supreme Court has emphasized, in protecting the initiative process, that "[t]he First Amendment protects [initiative proponents'] right not only to advocate their cause but also to select what they believe to be the most effective means for so doing." *Meyer v. Grant*, 486 U.S. 414, 424 (1988).

**F.      City of Columbus' Health Commissioner's refusal to take action under these exceptional circumstances.**

Having received no relief from the City Council, on May 6, 2020, Plaintiff Bill Lyons wrote on behalf of the Petitioners Committee to Dr. Mysheika Roberts, City of Columbus' Health Commissioner, who at that time had emergency powers, asking Commissioner Roberts to consult with Director Acton and the Governor to come up with an order "that the one-year petition signature-gathering period mandated by § 42-7 of the Charter of the City of Columbus be tolled from March 22, 2020 until the day that the Director's orders are terminated and the solicitation of signatures may safely resume. The point is to restore to the petitioners the three months of campaign time lost to the effects of the quarantine orders." (Lyons Decl. para. 11 and Ex. C.)

On May 8, the Health Commissioner responded by email stating that she was "aware of no provisions in state or city law that allow the health commissioner to suspend petition-related sections of the city charter. We would encourage you to continue working with the legislative branch of city government to explore solutions to your predicament." (Lyons Decl. para. 11 and Ex. C.)

Thus, Columbus Bill of Rights had exhausted other options to not lose its extensive work in signature gathering during this public health emergency through no fault of its own: the City Council cannot waive a requirement in the City Charter and has refused to bypass this impasse by using its power to simply submit the proposed charter amendment to the people, and the

Health Commissioner refused to use her emergency powers to stay the deadline, just a few months after the Governor had postponed the entire presidential primary in express contradiction of a court order.[6] The Committee of Petitioners now turns to this Court to protect the people's constitutional right to use the direct democracy process during the pandemic. Only a Court can order redress of this harm to the people's political rights under the unique circumstances of this coronavirus pandemic.

### III.     Petitioners Committee has stated a claim upon which the Court can grant relief.

The City's motion to dismiss only asserts 12(b)(6) failure to state a claim. Petitioners Committee demonstrates below that the facts of this case are more than sufficient to state a claim to relief that is plausible on its face. Indeed, other courts have granted relief in similar situations.

Petitioners Committee agrees with the City that the due process and equal protection claims can be dismissed (ECF No. 1, Complaint at 16-17 (Second and Third Causes of Action)). The parties have not developed those arguments because the First Amendment test for ballot access is certainly where this case will resolve. Therefore, below, Petitioners Committee provides the argument for why, as applied during the COVID pandemic, the First Amendment prevents the City from imposing its one-year signature gathering deadline on Petitioners Committee's proposed Charter amendment, and requires this Court to provide relief from the requirements of Charter section 42-7.

---

6  *E.g.*, Nick Corasaniti & Stephanie Saul, *Ohio's Governor Postpones Primary as Health Emergecy Is Declared Over Virus*, NEW YORK TIMES (Mar. 16, 2020), *available at* https://www.nytimes.com/2020/03/16/us/politics/virus-primary-2020-ohio.html.

A.      **The people's power to petition for a proposed charter amendment is constitutionally protected, and regulations on that process cannot be unduly restrictive.**

Article XVIII, §§ 7 and 9 of the Ohio Constitution reserves the people's power to amend their city charter through a petition process. The Columbus City Charter provides procedures for petitioning for a charter amendment in sections 42 and 45.

Where there are procedures for petitioning for a proposed law to appear on the ballot, the First Amendment applies to protect those procedures from violation of the people's political rights. Most of the case law is on the closely related initiative power, where the Sixth Circuit has held that "a state that adopts an initiative procedure violates the federal Constitution if it unduly restricts the First Amendment rights of its citizens who support the initiative." *Taxpayers United*, 994 F.2d 291, 295 (6th Cir. 1993) (citing *Meyer v. Grant*, 486 U.S. 414 (1988)). Accordingly, "although the Constitution does not require a state to create an initiative procedure, if it creates such a procedure, the state cannot place restrictions on its use that violate the federal Constitution." *Id.*

Here, Plaintiffs are challenging the as-applied constitutionality of only one section of the Columbus City Charter, and specifically the last sentence of that section that creates the one-year deadline, which under the circumstances of this pandemic has become a severe burden on the public's ballot access:

Sec. 42-7. - All petitions to be filed with city clerk.

All separate part-petitions providing for a proposed ordinance, referendum, recall, or charter amendment shall be filed at the same time, as one instrument,[7] with the city clerk. No alterations, corrections, or additions may be made to a petition after it is filed in a public office. Petitions for an initiated ordinance or charter amendment

---

7    Because the Court did not grant Petitioners Committee's motion for preliminary injunction, Petitioners Committee seeks relief from both section 42-7's one-year deadline and the "one instrument" requirement.

> shall be filed within one year of filing a certified copy of the same with the city clerk; petitions for recall or referendum shall be filed as otherwise provided for herein.

Based on recent Sixth Circuit decisions, this Court should apply *Anderson-Burdick* to Plaintiffs' challenges here, although *Meyer's* prohibition on interfering with signature gathering political speech is an alternative First Amendment test to reach the same relief. So as not to lose track of *Meyer*, we address it briefly before examining and applying the *Anderson-Burdick* test.

**B.      Insurmountable scrutiny applies here because the one-year deadline infringes on core political speech in petition circulation.**

A severe burden on core political speech imposed on signature gathering also violates the First Amendment. *Meyer v. Grant,* 486 U.S. 414 (1988). Under *Meyer*, courts "apply 'exacting scrutiny,' and uphold the restriction only if it is narrowly tailored to serve an overriding state interest." *McIntyre v. Ohio Elections Comm'n,* 514 U.S. 334, 347 (1995) (striking down Ohio statute prohibiting distribution of anonymous campaign literature).

Circulating signature petitions is core political speech, the activity directly at issue in *Meyer*. Applying *Meyer* gets to a similar test as *Anderson-Burdick's* "severe" burden standard, just that *Meyer* requires an "overriding" state interest rather than a "compelling" state interest. Parsing the difference there is like judging which Himalayan mountain is the tallest - it is irrelevant because the City cannot come close to climbing either under the circumstances of the pandemic.

*Meyer* serves as an independent reason for why the Court must apply strict scrutiny, independent of the ballot access burden in the *Anderson-Burdick* analysis.

**C.      *Anderson-Burdick*'s multiple standards for assessing ballot access violations.**

A severe burden on ballot access and freedom of association violates the First

Amendment. *Anderson v. Celebrezze*, 460 U.S. 780 (1983), as later refined in *Burdick v. Takushi*,

504 U.S. 428 (1992) ("*Anderson-Burdick*"). The Sixth Circuit has twice in the last two years

applied the *Anderson-Burdick* framework to First Amendment challenges to Ohio's statutory

requirements for initiative petitions. *See Schmitt v. LaRose*, 933 F.3d 628 (6th Cir. 2019), *reh'g*

*en banc denied* (6th Cir. Sept. 4, 2019), cert. pending, No. 19-974 (filed Feb. 3, 2020); *see also*

*Committee to Impose Term Limits v. Ohio Ballot Board*, 885 F.3d 443 (6th Cir. 2018). In the

context of the COVID pandemic, the Sixth Circuit has also provided relief from signature

deadlines for candidates, as discussed below.

The First Amendment applies here because Columbus City Charter section 42-7

"regulate[s] the mechanics of the initiative process[.]" *See Daunt v. Benson*, 956 F.3d 396, 422

(6th Cir. Apr. 15, 2020) (Readler, J., concurring) ("*Anderson-Burdick* is tailored to the regulation

of election mechanics."); *see also Schmitt*, 933 F. 3d at 639 ("Instead, we generally evaluate First

Amendment challenges to state election regulations under the three-step *Anderson-Burdick*

framework"); *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 345 (1995) (explaining

*Anderson's* "ordinary litigation" test did not apply because unlike the statutory provisions in

*Anderson*, the challenged statute did not control the mechanics of the electoral process. It is a

pure regulation of speech.").

*Anderson-Burdick* provides a 'flexible standard'" to evaluate "'[c]onstitutional challenges

to specific provisions of a State's election laws'" under the First Amendment. *See Daunt v.*

*Benson*, 956 F.3d at 406 (citing *Anderson*, 460 U.S. 780 and *Burdick*, 504 U.S. 428 (1992)).

Under *Anderson-Burdick*, "[a] court considering a challenge to a state election law must weigh

'the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate' against 'the precise interests put forward by the State as justifications for the burden imposed by its rule,' taking into consideration 'the extent to which those interests make it necessary to burden the plaintiff's rights.'" *Burdick*, 504 U.S. at 434 (quoting *Anderson*, 460 U.S. at 789). The severity of the burden on those rights determines the level of scrutiny to be applied. *See Daunt*, 956 F.3d at 407 (citing *Burdick*, 504 U.S. at 434). "When a state promulgates a regulation which imposes a 'severe' burden on individuals' rights, that regulation will only be upheld if it is 'narrowly drawn to advance a state interest of compelling importance.'" *Lawrence v. Blackwell*, 430 F.3d 368, 373 (6th Cir. 2005) (quoting *Burdick*, 504 U.S. at 434).

But "minimally burdensome" regulations are subject to "a less-searching examination closer to rational basis," *Committee To Impose Term Limits*, 885 F.3d at 448, and "a State's important regulatory interests will usually be enough to justify reasonable, nondiscriminatory restrictions." *Schmitt*, 933 F.3d at 639 (citing *Timmons*, 520 U.S. at 358). "Regulations falling somewhere in between—*i.e.*, regulations that impose a more-than-minimal but less-than-severe burden—require a 'flexible' analysis, 'weighing the burden on the plaintiffs against the state's asserted interest and chosen means of pursuing it.'" *Daunt*, 956 F.3d at 408 (quoting *Ohio Democratic Party v. Husted*, 834 F.3d 620, 627 (6th Cir. 2016)). "This level of review is called 'intermediate scrutiny.'" *Esshaki*, 813 Fed. Appx. 170 (6th Cir. 2020).

This Court should apply the reasoning of the Sixth Circuit's recent opinion in *Esshaki v. Whitmer*, 813 Fed. Appx. 170 (6th Cir. 2020), where the court upheld the core of the district court's preliminary injunction enjoining Michigan from enforcing the statutory ballot access

provisions for political candidates in advance of Michigan's upcoming primary election under the framework established in *Anderson-Burdick.*

In *Esshaki*, the plaintiffs asserted that Michigan's March 23, 2020 Stay-At Home Orders issued in response to the COVID-19 pandemic prevented them collecting the required candidate qualification signatures by the April 21, 2020 deadline, and that Michigan's enforcement of the statutory requirements "under the present circumstances, is an unconstitutional infringement on their (and voters') rights to association and political expression." *Id.* at 1. Michigan, like Ohio, "insist[ed] on enforcing the signature-gathering requirements as if its Stay-at-Home Order . . . had no impact on the rights of candidates and the people who may wish to vote for them." *Id.* Like the City of Columbus, Michigan also argued that circulators should have braved the crisis and gathered signatures. The district court rejected the state's argument as "both def[ying] good sense and fl[ying] in the face of all other guidance that the State was offering to citizens at the time." *Id.* "[P]rudence at that time counseled in favor of doing just the opposite." *Id.*

Applying *Anderson-Burdick*, the district court found a severe burden on the Plaintiffs' First Amendment rights and applied strict scrutiny to invalidate the combined effects of the emergency orders, Michigan's in-person signature collection requirements, and the pandemic. The district court concluded that "[u]nder these unique historical circumstances," the state's enforcement of its Stay-at-Home Order and the statutory ballot-access requirements operated "in tandem to impose a severe burden on Plaintiff's ability to seek elected office, in violation of his First and Fourteenth Amendment rights to freedom of speech, freedom of association, equal protection, and due process of the law." *Id.* The court noted that the plaintiff was "challenging neither the constitutionality of the State's ballot access laws nor the Governor's Stay-at-Home

Order in isolation. Rather, Plaintiff seeks relief because the two regulations, taken together, have prevented him from collecting enough signatures before the deadline." *Id.*

The Sixth Circuit agreed with the district court that under *Anderson-Burdick*, "the combination of the State's strict enforcement of the ballot-access provisions and the Stay-at-Home Orders imposed a severe burden on the plaintiffs' ballot access, so strict scrutiny applied, and even assuming that the State's interest (*i.e.*, ensuring each candidate has a reasonable amount of support) is compelling, the provisions are not narrowly tailored to the present circumstances." *Id.* The court concluded that Michigan's strict application of its ballot-access provisions was thus unconstitutional as applied to the plaintiffs. *Id.*

*Esshaki* provides the appropriate analysis for this case, even though it concerns a candidate seeking ballot access rather than a proposed Charter amendment seeking ballot access. Like charter amendment petitions and initiative petitions, there is "no fundamental right to run for elective office," and yet the Supreme Court has recognized laws restricting candidates' access to the ballot implicate the First Amendment because they "'place burdens on two different, although overlapping, kinds of rights—the right of individuals to associate for the advancement of political beliefs, and the right of qualified voters, regardless of their political persuasion, to cast their votes effectively.'" *Esshaki*, 813 Fed. Appx. 170 (6th Cir. 2020) (quoting *Williams v. Rhodes*, 393 U.S. 23, 30-31 (1968)). Similarly, "[a] state that adopts an initiative procedure violates the federal Constitution if it unduly restricts the First Amendment rights of its citizens who support the initiative." *Taxpayers United*, 994 F.3d at 295; *see also Buckley*, 525 U.S. at 190-91 ("Initiative petition circulators also resemble candidate-petition signature gatherers, however, for both seek ballot access.") (citing *Timmons v. Twin Cities Area New Party*, 520 U.S. 351(1997)).

On June 11, 2020, the Eastern District Court of Michigan decided *SawariMedia LLC v. Whitmer*, 963 F.3d 595 (6th Cir. 2020), granting a preliminary injunction against "the strict application of Michigan's signature requirement and filing deadline for ballot initiatives [as] unconstitutional as applied here." The court applied *Esshaki* to an initiative. In that case, SawariMedia was required to turn in petitions on May 27, 2020. The District Court found that, in facts very similar to Petitioners Committee here, "[b]y early March, SawariMedia appeared to be well on its way to collecting a sufficient number of signatures to place its initiative on the November 2020 general election ballot." *Id.* at 6. "But then, the world changed." *Id.* at 7. The Michigan Governor's March 13 and March 19 orders prohibiting large gatherings, and May 7, 18, and 21 orders extending stay-at-home provisions, included "Constitutional Exemption Language" that provided that the orders did not "abridge protections guaranteed by the state or federal constitution under these emergency circumstances." *Id.* at 8-9. After attempting to mail petitions to potentially interested signers, but finding that method involved "a substantial amount of money" and time delays, "SawariMedia insists that Governor Whitmer's executive orders, and the enforcement of those orders, "made it impossible" to collect the required number of signatures by the May 27, 2020, filing deadline." *Id.* at 10.

**D.    The Columbus City Charter's one-year deadline is state action that infringes on Plaintiffs' ballot access, regardless of whether the State of Ohio pandemic orders limited petition circulation.**

Before applying the *Anderson-Burdick* test to Columbus City Charter section 42-7 as applied to this Charter amendment petition during the pandemic, we must first address the threshold issue of state action.

The state action challenged here is the strict enforcement of the Columbus City Charter's deadline for turning in signed petitions for a proposed Charter amendment. Therefore, it should

be irrelevant to this Court's analysis whether there is or was an exemption in Ohio's Stay-at-Home Orders for circulating petitions and other political activities. This conclusion is consistent with the holding in *Esshaki*, where the Sixth Circuit held that Michigan's "strict application of the ballot-access provisions is unconstitutional as applied here" due to the "combination of the State's strict enforcement of the ballot-access provisions and the Stay-at-Home Orders[.]" 813 Fed. Appx. 170, 171 (6th Cir. 2020).

Courts have granted relief in the aftermath of natural disasters based on states' continued enforcement of election regulations. *See e.g., Florida Democratic Party v. Scott,* 215 F.Supp.3d 1250 (N.D. Fla. 2016) (requiring state to extend voter registration deadline in the face of Hurricane Matthew); *Georgia Coalition for the Peoples' Agenda, Inc. v. Deal*, 214 F.Supp.3d 1344 (S.D. Ga. 2016) (same). Just as a hurricane is not a state action, the COVID pandemic is not either. To protect public health people have to continue to do social distancing, regardless of the particular exceptions provided in the State of Ohio's COVID orders.

**E.      The facts of this case are more analogous to *Esshaki* and *SawariMedia* than to *Thompson*.**

In *Thompson v. DeWine*, the Sixth Circuit recently stayed a Southern District preliminary injunction order that had provided various forms of relief to several potential initiative campaigns, 959 F.3d 804 (6th Cir. 2020), and ultimately reversed the Southern District's grant of a preliminary injunction, 976 F.3d 610, 614 (6th Cir. 2020). The *Thompson* plaintiffs had requested the court enjoin state ballot access requirements, accept electronically signed and witnessed petitions, extend petition submission deadlines, and vaguely "reduce the burden on ballot access." *Id.* In contrast, here, Petitioners Committee requests only relief from City Charter section 42-7, significantly its one-year deadline to turn in petitions. Also, and significantly, the

overall timeline around the Columbus Community Bill of Rights is different from *Thompson*,
and make *Esshaki* the more appropriate analogue. Here, as in *Esshaki*, the pandemic orders hit
the final months of Plaintiffs' signature gathering effort. *See Thompson*, 959 F.3d 804, discussing
the timeline of events in deciding to distinguish *Esshaka* by observing that "Michigan abruptly
prohibited the plaintiffs from procuring signatures during the last month before the deadline,
leaving them with only the signatures that they had gathered to that point." (citation omitted).

The Sixth Circuit in *Thompson* also considered the state's pandemic order exception for
"petition or referendum circulators" to be "vitally important." *Id.* at 7. But that provision cannot
be read in isolation from the rest of the Order, nor in isolation from the social conditions created
by the pandemic. Dr. Acton's April 30 Order[8] "that Reopens Businesses, with Exceptions, and
Continues a Stay Health and Safe at Home Order," preliminarily states that avoiding unnecessary
contacts "will benefit everyone." Dr. Acton's Order then orders everyone "to stay at home or at
their place of residence except as allowed in this Order," (Para. 3), and prohibits "[a]ll public and
private gatherings of any number of people" unless they are members of the same household,
family, or residence, attending a wedding or funeral, a religious facility, or "[t]his Section does
not apply to First Amendment protected speech, including petition or referendum circulators and
any activity by the Media . . . ." (Para. 4.) Paragraph 18 provides the statutory authority for
enforcement, and paragraph 19 provides that penalty is a second degree misdemeanor. Also
relevant in the 14-page Order is paragraph 17, which asserts that the "intent of this Order is to
ensure that the maximum number of people self-isolate in their places of residence to the
maximum extent feasible, while enabling additional day to day activities to continue, to slow the
spread of COVID-19 to the greatest extent possible." Read in its entirety, the April 30 Order is

---

8  Available at https://coronavirus.ohio.gov/static/publicorders/Directors-Stay-Safe-Ohio-Order.pdf.

clear that people should stay home, but that nobody will be punished for engaging in First Amendment activity ("including petition or referendum circulators"). Petition circulators are still free to stand in front of closed libraries, empty stadiums, and vacant festival grounds: the "First Amendment exception" language of the state orders is not the point.

Here, Plaintiffs challenge the one-year deadline in the City Charter as applied during this pandemic, at a time when everyone is ordered to stay home to, as Dr. Acton wrote, "do more than the minimum [in regard to social distancing] to act safely, [because] it will benefit everyone." As described above, Plaintiffs built their signature gathering campaign (as most campaigns do) around petitioning during large gatherings. Without these large gatherings, it is meaningless for Plaintiffs and the campaign volunteers to retain the right to gather signatures; they cannot do that while people are social distancing and large gatherings are canceled.

In granting a preliminary injunction, the *SawariMedia* court analyzed both the Sixth Circuit's *Esshaki* and *Thompson* orders. *SawariMedia LLC v. Whitmer*, 963 F.3d 595 (6th Cir. 2020). The *SawariMedia* court focused on the differences between the First Amendment exceptions between the Michigan and Ohio orders, and appropriately concluded that the "Constitutional Exemption Language" in some of the Michigan orders was "far from clear that that language permitted citizens to gather petition signatures." *Id.* at 21. As emphasized by Professor Brown in the *Thompson* stay reconsideration motion, any attempt to just exempt constitutionally protected activity with just a reference to the constitutional provision is "far from clear" – aka, unconstitutionally vague. While the State of Ohio made this more specific on April 30 by adding "including petition or referendum circulators" (after the *Thompson v. DeWine* litigation started), this language still does not change the conditions on the ground: large

gatherings are still canceled, people are still reasonably concerned about spreading the virus, and - as the April 30 Order still emphasized - people are still supposed to stay home.

On April 30 Ohio made it clear that one would not be guilty of a misdemeanor for circulating a petition. But that did not change the reality that, even in the conditions in early summer where the curve has been flattened and was slowly going down (only to spike dramatically later in 2020 as pandemic fatigue set in and people let down their guard), circulating a petition during this pandemic would have been as effective as circulating a petition just after a hurricane. As the *SawariMedia* court said about campaigns proactively stopping signature gathering in the pandemic: "Plaintiffs should be commended for putting the public health of Michiganders above their own self-interest and desire to collect the required number of signatures, not denigrated for making that conscientious choice." *Id.* at 25 (citing *Fair Maps Nevada v. Cegavske*, 2020 WL 2798018, at *13 (D. Nev. May 29, 2020) ("The Court does not find the fact Plaintiffs stopped collecting signatures in early March - after the COVID-19 outbreak started in Nevada, but before the Stay at Home Order went into effect - weighs against finding diligence here. Forcing circulators to go out to collect signatures during the COVID-19 pandemic is unreasonable and unwise.")).

**F.      Columbus' one-year deadline is a severe burden to ballot access under these pandemic conditions.**

The issue before this Court is thus similar to the issue in *Esshaki*—whether strict enforcement of Ohio's signature requirements, combined with the COVID-19 pandemic and effect of the Stay-at-Home Orders, unconstitutionally burden Plaintiffs' First Amendment rights *as applied here*.

The Court should first consider the "character and magnitude" of the burden on Plaintiffs' First Amendment rights under *Anderson-Burdick*. Plaintiffs contend that the one-year deadline, as applied during this pandemic, is a "severe" burden as it has made it impossible to qualify the Charter amendment for the ballot. "'The hallmark of a severe burden is exclusion or virtual exclusion from the ballot.'" *Schmitt*, 933 F.3d at 639 (quoting *Libertarian Party of Ky. v. Grimes*, 835 F.3d 570, 574 (6th Cir. 2016). "In some circumstances, the 'combined effect' of ballot-access restrictions can pose a severe burden." *Grimes*, 835 F.3d at 575. "A very early filing deadline, for example, combined with an otherwise reasonable petitioning requirement, can impose a severe burden, especially on independent candidates or minority parties that must gather signatures well before the dominant political parties have declared their nominees." *Id.* at 575. In contrast, "[a] burden is minimal when it 'in no way limit[s] a political party's access to the ballot.'" *Id.* at 577 (quoting *Libertarian Party of Ohio v. Blackwell*, 462 F.3d at 537). In *Esshaki*, the Sixth Circuit agreed with the district court that "the combination of the State's strict enforcement of the ballot-access provisions and the Stay-at-Home Orders imposed a severe burden on the plaintiffs' ballot access[.]" 813 Fed. Appx. 170, 171 (6th Cir. 2020).

Here, as in *Esshaki*, the one-year deadline imposed by the Columbus City Charter under the conditions of this pandemic closes the door on any more signature gathering on this proposed Charter amendment, and thus closes the door on ballot access. There is no alternative around that deadline (short of the court order sought here). Plaintiffs attempted to work with the City and public health officials at a time when they were waiving every deadline under law, except this one. Plaintiffs are a grassroots organization with minimal funds, doing volunteer signature gathering on a city charter amendment. Restarting their signature gathering after collecting 9000 signatures is a "severe" burden on ballot access.

As a "severe" burden on ballot access in this context, the one-year deadline for turning in signed petitions must meet strict scrutiny. The City has the burden of presenting a compelling state interest in maintaining the one-year deadline as applied here during this pandemic, and the deadline must be "narrowly drawn to advance a state interest of compelling importance." *See Burdick*, 504 U.S. at 434. Indeed, the deadline must be "narrowly tailored *to the present circumstances*." *Esshaki*, 813 Fed. Appx. at 172 (6th Cir. 2020).

If the Court agrees with the severe burden analysis above, then the City's motion to dismiss must surely be dismissed. The reality is that the Orders and the COVID-19 pandemic have made it impossible for Plaintiffs to satisfy the City Charter one-year deadline. Because the burden imposed by the enforcement of the requirements in these circumstances is severe, strict scrutiny is warranted, and cannot be met here because the City lacks both a compelling interest and a narrowly-tailored remedy that justify this deadline as applied under the circumstances of this pandemic.

**G.      Even if the Columbus City Charter deadline on signature gathering, when applied during this pandemic, is a less-than-severe burden, the City's interests here do not outweigh Petitioners Committee's right to ballot access.**

In *Thompson*, the State of Ohio advanced three state interests. *See Thompson v. DeWine*, Order Staying District Court Preliminary Injunction, at 9 and fn. 4, No. 20-3526 (6th Cir., May 26, 2020). They included "witness and ink requirements help prevent fraud" (here, Plaintiffs do not seek to modify those requirements); "the deadlines allow them time to verify signatures in an orderly and fair fashion, while also providing initiative proponents time to challenge any adverse decision in court" (here, the Columbus City Charter, section 45-2, already provides flexibility in which election a petitioned measure will go on); and "ensuring that each initiative on the ballot has a threshold amount of support to justify taking up space on the ballot" (here, Plaintiffs do not

seek to modify the number of valid signatures requirement). As the Sixth Circuit points out, the threshold support "interest is more appropriately related to Ohio's number of signatures requirement." *Thompson*, *supra*, at fn. 4 (citation omitted).

None of the State's interests from *Thompson* justify the City's one-year deadline at issue in this case. While the deadline may be valuable from an administrative perspective, as it allows the City Clerk to know which petitions are currently active, and to anticipate workload when those petitions are due, those are not compelling government interests, nor does the City argue they are.

Even if the Court analogizes to *Thompson*, Plaintiffs here are challenging a specific unique regulation not before the *Thompson* court, they do so in defense of the last months of their signature gathering campaign, and they seek a narrow remedy that lacks the risk for unintended consequences that the *Thompson* Sixth Circuit Court was concerned about.

While under normal circumstances, the one-year deadline may be a "reasonable nondiscriminatory restriction," *Burdick v. Takushi*, 504 U.S. 428, 434 (1992), it becomes a severe burden under the pandemic for the Plaintiffs who suddenly lost the *last and most productive* 98 days of their signature gathering year. *Schmitt*, 933 F.3d at 639 ("The hallmark of a severe burden is exclusion or virtual exclusion from the ballot.").

In this pandemic, the government has already preemptively changed many routine regulatory deadlines, from the IRS's federal tax deadline, to Ohio's statutes of limitations and deadlines for issuing warrants. Ohio HB 197, Sec. 22 (tolling, e.g., all civil statutes of limitation that expire between March 9, 2020 and July 30, 2020 without limitation or exclusion, notably applying that tolling to statutes of limitation that had expired in the several weeks between the start of the emergency and the bill's passage on March 25, in Section 22(B): "This Section

applies retroactively to the date of the emergency declared by Executive Order 2020-01D, issued on March 9, 2020"); Supreme Court of Ohio March 27, 2020, Tolling Order (tolling court rule deadlines to work in conjunction with HB 197).[9]

Indeed, were the deadline at issue in this case imposed by Ohio Revised Code, rather than by the Columbus City Charter, it would have already been tolled by the state legislation referenced above, HB 197, which included a catch-all provision that "[a]ny other criminal, civil, or administrative time limitation or deadline under the Revised Code" is tolled if it is to occur between March 9, 2020 and July 30, 2020. HB 197 Sec. 22(A)(10). Only because this is a Charter requirement – analogous to a Constitutional requirement – must the Petitioners Committee seek relief from the Court.

As the City quoted, at MTD 11: "The hallmark of a severe burden is exclusion or virtual exclusion from the ballot." *Schmitt*, 933 F.3d at 639 (quotations and citations omitted). Petitioners Committee agrees that under most circumstances, as the City said, "The City Charter's one-year signature-gathering deadline is non-discriminatory, content-neutral, and provides ample time for proponents of a petition to gather signatures." MTD at *id.* And the City and Petitioners Committee agree that this case is only challenging the constitutionality of the one-year deadline "under the circumstances of the COVID-19 pandemic…." *Id.* But at that point the parties part ways, as the City then attributes Petitioners Committee's constitutional injury to the state's public health orders, rather than the circumstances of the pandemic as a whole.

After natural disasters like hurricanes, federal courts routinely alter the rules of elections. *Supra*, at 20. COVID-19 is analogous to those hurricanes, and the Court must consider the one-year deadline in that context. Just like many people started wearing masks and practicing social

---

9   See http://www.supremecourt.ohio.gov/tolling/default.asp.

distancing before the state ordered those actions, Petitioners Committee prudently did "more than the minimum to act safely, [to the] benefit [of] everyone," as Dr. Acton wrote, *supra*. The result was "virtual exclusion from the ballot," the "hallmark of a severe burden," per *Schmitt*, *supra.* It would have been impossible to have anticipated COVID early enough in the year to adjust signature gathering plans, nor was it socially responsible to gather signatures during the pandemic, nor was it possible given that big events were canceled. While many of those events were canceled due to government orders, that itself is irrelevant; airlines haven't been grounded by government order but very few people are choosing to fly. It's the biological reality of a pandemic that required Petitioners Committee to stop signature gathering, and the courts can, and do, take such disasters into account. The state action here is expressly stated in Columbus City Charter section 42-7: that law, applied in these circumstances, is what excludes this proposed Charter amendment from the ballot.

Petitioners should be allowed to show evidence that it is patently unreasonable to expect a signature campaign to finish over three months before its deadline, or anticipate the COVID pandemic, or otherwise recover the lost time suddenly sprung upon Petitioners Committee by the pandemic. The City wants to turn this factual question into a matter of law, but fundamentally the Court's decision as to how severe the burden was depends on whether it would have been physically possible to complete signature gathering in spring 2020. The Motion to Dismiss should be denied.

**1.     The City's interests in imposing the one-year deadline are insignificant, and balanced against Petitioners Committee's ballot access right, weigh in favor of the Petitioners Committee.**

Even if Petitioners Committee only faced, as the City says, an "intermediate" burden, MTD at 15, that standard still requires "a flexible analysis that weighs the state's interests and

28

chosen means of pursuing them against the burden of the restrictions." MTD at 10 (quoting

*Schmitt*, 933 F.3d at 639 (quoting *Libertarian Party of Ky. v. Grimes*, 835 F.3d 570, 574 (6th Cir.

2016)) (internal quotations omitted)).

*Thompson* ultimately applied the intermediate burden test:

> When the burden is intermediate, we weigh it against "the precise interests put forward by the State as justifications for the burden imposed by its rule." *Anderson*, 460 U.S. at 789, 103 S.Ct. 1564; *see also Thompson*, 959 F.3d at 808. In doing so, we consider "the extent to which those interests make it necessary to burden the plaintiff's rights." *Thompson*, 959 F.3d at 808 (quoting *Burdick*, 504 U.S. at 434, 112 S.Ct. 2059). It's this level of scrutiny that we apply to Ohio's laws here.

976 F.3d at 616. In doing so, the *Thompson* court noted that:

> this stage of the analysis is flexible, and we give states considerable leeway to pursue their legitimate interests. *Buckley v. Am. Const. Law Found.*, 525 U.S. 182, 191, 119 S.Ct. 636, 142 L.Ed.2d 599 (1999). And all that's required for the State to win at this step is for its legitimate interests to outweigh the burden on Plaintiffs' First Amendment rights. *Thompson*, 959 F.3d at 811. The method the State chooses to pursue its interests need not be narrowly tailored. *Id.*

976 F.3d at 619.

For its legitimate and affected interests, the City really only cites an interest in applying

its election laws. MTD at 14. But the City ignores the standard from the cases it cites: that those

election laws must be "*reasonable* regulations of parties, elections, and ballots to reduce

election- and campaign-related disorder," *Timmons* (emphasis added), or laws that "*protect the*

*integrity and reliability* of the initiative process," *Buckley* (emphasis added). MTD at 14 (citing,

with the above quotes, *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358 (1997);

*Buckley v. Am. Constitutional Law Found.*, 525 U.S. 182, 191 (1999). Here, the City just wants

the Court to find that its laws-for-the-sake-of-laws interest is enough to outweigh First

Amendment infringement. But that is not the test. The Supreme Court has clearly held – as cited

by the City itself – that those laws must reasonably serve to protect the integrity and reliability of

the initiative process. That detail is critical for why this case is distinguished from *Thompson.* The details here matter:

First, signature gathering does serve an important role in the integrity and reliability of the initiative process. Collecting sufficient signatures is the threshold for showing that a measure has sufficient support to go on the ballot for a vote of the people. *See Hawkins v. DeWine*, 968 F.3d 603, 607 (6th Cir. 2020) ("[R]equiring a modicum of support for ballot access furthers the State's substantial interest in fair and orderly elections by avoiding 'overcrowded ballots.'" (citation omitted)). Petitioners Committee do not ask this Court to lower the signature threshold due to the pandemic, or allow novel electronic or remote signature gathering methods not yet tested by election officials. *See id.* ("[T]he in-person signature requirements further the State's interest in verifying the authenticity of the signatures, thereby decreasing the odds that fraud will corrupt Ohio's election process." (internal quotation omitted)). Instead, Petitioners Committee simply asks for additional time to collect signatures. The same number of valid signatures will be required, so the City's valid legitimate interest in "ensuring the proposed Charter amendments have a modicum of support" is not altered. MTD at 15. It's signature verification – not the one-year deadline – that ensures, as the City says, that "the petition was signed by voters who still live in Columbus and support the initiative." MTD at 15. Plaintiffs do not seek any modification of the signature verification process, and the City and Boards of Election will have the same amount of time to verify signatures as they would have without this Court's relief. That relief could be tailored to be exactly the same number of days that Petitioners Committee lost due to the pandemic, although as described below, Petitioners Committee believes its suggested remedy is the best balance of ballot access rights, the City's interests, and public health. The City does not explain how Petitioners Committee's proposed remedy would harm the integrity and reliability of the initiative process, and instead raises red-herring arguments that should have no

30

weight in the Court's analysis: signature validity (which is done by the BOEs and unrelated to the one-year deadline), other petitions (there aren't any).

Second, with regard to timing of the election, Petitioners Committee did not ask the Court to give it more time *but still* allow the proposed Charter amendment onto the November 2020 ballot. *See Hawkins v. DeWine*, 968 F.3d 603, 607 (6th Cir. 2020) ("[T]he State argues that enforcement of the deadlines for submitting petitions ensures that election officials have time to verify the signatures, that any necessary judicial review can proceed, and that ballots can be printed in time to send to military and overseas voters."). Certainly, Petitioners Committee wanted its measure to appear on that presidential high-turnout ballot, and Petitioners Committee had started their petitioning campaign in the summer of 2019 timed for the November 2020 ballot. But Petitioners Committee do not request an extension of time *and* access to the November 2020 ballot, or any particular ballot for that matter. The time between petition turn-in and the election is critical for an orderly and reliable election process. Other cases – including *Thompson*, *see* 976 F.3d at 618 – sought to keep access to the November 2020 ballot while shortening the time that election officials had between petition turn-in and ballot printing. That relief could reasonably be seen as a threat to the integrity and reliability of the election, because election officials would have less time to verify signatures and prepare ballots. But that is not an issue here because Petitioners Committee has recognized that the pandemic requires sacrifice from everyone: they knew when they stopped signature gathering in March that they would not get to the November 2020 ballot. All they are asking for is the opportunity to start up where they left off. In the City's initiative process, the petition turn-in date determines which election the measure will appear on, and therefore there is no concern – like in *Thompson* – that the Court's relief will cause a rushed election process. The *Thompson* plaintiffs requested, in the Sixth Circuit's words, "a plenary re-writing of the State's ballot-access provisions," 976 F.3d 610, 620

(quoting *Esshaki*), when "the district court [in *Thompson*] ordered Ohio to accept electronically signed and witnessed petitions and extended the deadline for submitting petitions [for the November 2020 election]." *Id.* Here, in contrast, Petitioners Committee only wants to pick up where they left off, which will not cause any rushed process for election officials if the Court crafts a remedy that allows Petitioners Committee to turn-in signatures at a time that won't trigger a special election (which is part of Petitioners Committee's requested relief). This is an incredibly narrow remedy, and completely not analogous to the *Thompson* injunction overruled by the Sixth Circuit.

The City's Motion to Dismiss, at pages 15-16, attempts to present the one-year deadline as the holy grail of election integrity. If that were true, then every city and county would have a one-year deadline, but to Plaintiffs' knowledge, among Ohio's local governments, the signature collection deadline rule is unique to Columbus. The one-year deadline does not do what the City claims it does. To ensure Plaintiffs have covered all the City's interest arguments:

- "The deadline and signature requirements serve legitimate and compelling state interests in giving the City and board of elections time to verify signatures, prevent fraud, and review the petition in an orderly fashion." MTD at 16, citing ECF No. 7. Actually, the City and BOEs will have the same amount of time to do those tasks.

- The City, MTD at 16, cites *Lawrence v. Blackwell*, 430 F.3d 368, 375 (6th Cir. 2005) (finding that the State's petition deadline requirement for independent congressional candidates "meets Ohio's important state interest of equal treatment of candidates and its administrative interest of being able to process . . . petitions and verify signatures in the midst of completing a host of other tasks necessary to conduct a fair election"). But again, this Court's remedy can set a date certain for petition submission, which will allow

for advanced planning for task management. Plaintiffs are not requesting less time between turning in petitions and the election the measure will appear on, and if election officials need more time than is normally provided, Plaintiffs will certainly agree to more time.

- The City also cites, at MTD at 16, *Taxpayers United for Assessment Cuts*, 994 F.2d at 297 (finding that a state has a strong interest in "ensuring that its elections are run fairly and honestly"); *Spencer v. Blackwell*, 347 F. Supp. 2d 528, 536 (S.D. Ohio November 1, 2004) ("Prevention of election fraud is a compelling state interest."). Of course, these are compelling government interests, but the City does not explain how the one-year deadline ensures fair, honest, and fraud-free elections, nor can the City do so, because the one-year deadline does not do any of that. If there were another petition for an initiative or Charter amendment measure in Columbus that was similarly situated to Petitioners Committee's, then certainly fairness would require similar relief, but there is not another measure at play, and the COVID-19 emergency in 2020 is hopefully a once-in-a-century event. *See generally,* John M. Barry, THE GREAT INFLUENZA: THE STORY OF THE DEADLIEST PLAGUE IN HISTORY (2004).

The City of Columbus only created the one-year requirement in 2014. Ord. 1748-2014 (July 21, 2014). It's disingenuous to suggest that modifying that requirement in order to balance public health, political rights, and election integrity during this pandemic will lead to election fraud, unfairness, and dishonesty. The City has not presented any explanation of how that will happen, and Plaintiffs cannot hypothesize a scenario either.

If the Court gives weight to the City's law-for-laws-sake interest, then it opens the door to legitimizing all sorts of unreasonable election laws. The City could impose a one-day signature

gathering window, because why couldn't an initiative's proponents organize a massive army of volunteers for a single day? The City could impose a signature threshold of 100% of the voters, because why not require the whole electorate to show they want the measure to go on the ballot? The City only has a legitimate interest in imposing reasonable laws that further election integrity and reliability. *See* U.S. Supreme Court cases cited at MTD at 14. Here, for Plaintiffs, with 98 days of signature gathering left during the initial months of the COVID pandemic, that one-year deadline is not a reasonable election law.

The people must resort to direct lawmaking only when the people's elected officials will not take appropriate action themselves. Direct lawmaking is not easy, nor should it be, but it also cannot be a severe burden and inaccessible to dedicated and organized people without access to the halls of power, even city hall. Thus direct democracy and representative democracy have inherent tension, just like the tension with separation of powers between the legislature, executive, and judiciary. The courts must diligently scrutinize the government's arguments against direct democracy, because direct democracy does not serve the government's interests. Instead, it is a peaceful tool the people use when they find that their government does not represent their interests. Just like the courts protect constitutional rights against government violation, the courts must also scrupulously defend direct democracy, as it too is a political constitutional right exercised by the people collectively.

Thus, even if the Court finds that intermediate scrutiny applies here, the City has failed to state an interest sufficient to justify infringing on the people's First Amendment ballot access right, by imposing the deadline in City Charter section 42-7. The Court must deny the City's motion because Petitioners Committee has stated a claim upon which relief can be granted.

**IV.     Petitioners Committee have stated a claim upon which relief can be granted.**

Plaintiffs have brought a narrow case, seeking a court order that addresses only a single recently-added section of petition regulation, Columbus City Charter section 42-7.

As discussed above, Plaintiffs are not seeking to modify the one-year deadline and still achieve access to the November 2020 ballot. Thus there are no concerns about compressed timelines for the City and Boards of Elections to verify signatures, craft a ballot title, print ballots, and otherwise administer a fair and orderly election.

Nor are Plaintiffs asking for a remedy that involves changing the rules of how they gather signatures, such as waiving the inked signatures requirement or witnessing requirement. Plaintiffs simply request more time to collect signatures due to the increased social distancing that is necessary to prevent the serious harm of community transmission of COVID-19.

The City and the people of Columbus do not face any harm from issuing an order to suspend or stay the one-year deadline. Indeed, the people of Columbus benefit from Plaintiffs and the campaign prioritizing public health measures and not unnecessarily risking spreading the virus.

As one commentator has mentioned in recent analysis of how the courts have treated direct democracy during this pandemic, unlike in other recent cases, here it is not "difficult to craft a remedy that would put the plaintiffs in the position they would have been in had there been no pandemic and that does not usurp the state's general role in enforcing its election rules or undermine sound principles of election administration and fairness." Richard L. Hasen, *Direct Democracy Denied: The Right to Initiative in a Pandemic*, 89 U. CIN. L. REV. 176 (2020).[10]

_____

10  Also available at https://ssrn.com/abstract=3608472 or
    http://dx.doi.org/10.2139/ssrn.3608472.

Professor Hasen suggests that in these cases courts should try "to put the plaintiffs in the position they would have been in if there had been no pandemic." *Id.* at 10.

Thus, here, the Court can fashion a straightforward remedy by substantially waiving the one-year deadline, and allowing Petitioners Committee to turn in a second batch of petitions, which would allow Plaintiffs to modify their campaign's signature gathering practices as the public health emergency evolves. As Governor DeWine and Secretary of State LaRose said in canceling the primary election in spring 2020, the people "mustn't be forced to choose between their health and exercising their constitutional rights."[11]

Plaintiffs suggested relief is that the Court extend the one-year deadline out to June 18, 2022, and allow Plaintiffs to submit a second batch of petitions. There are several reason for requesting this extended deadline, rather than just an additional 98 days:

**Coronavirus uncertainty.** An extended deadline for Plaintiffs ensures that they are not pressured to continue signature gathering when public health officials recommend that people minimize their contacts. Plaintiffs will be able to modify their signature gathering practices as the public health measures change.

**Lost signature gathering opportunities without large events.** An extended deadline would make up for the lost opportunity to gather signatures that Plaintiffs have suffered since early March 2020. Just replacing the number of *days* lost is not enough, because what matters is the *opportunity* to gather signatures during those days.

**Election choice and avoiding triggering a special election.** An extended deadline ensures that Plaintiffs have not further lost one of the critical strategic decisions that they make

---

11  Reported in, e.g., https://www.wcpo.com/news/coronavirus/live-ohio-gov-mike-dewine-gives-pre-primary-update-on-covid-19.

under Columbus' petition rules: on which ballot will their measure appear. *See* Charter section 45-2 (requiring a special election unless a regular election is available 60 to 120 days from the city council's ministerial vote to place the petitioned proposed charter amendment on the ballot). Additionally, this extended time relief ensures that the committee of petitioners will not have to trigger a special election (at additional expense to the City) based on a forced petition deadline.

**No additional relief sought.** Finally, this remedy allows the Plaintiffs to not seek additional relief such as electronic petition forms and e-signatures, which would likely be necessary to facilitate the petitioning process under an expedited timeline during this pandemic, as Plaintiffs recognize that these electronic processes are not easy to quickly set up at low cost, and could produce administrative challenges for the City and Boards of Elections.

## V.       Conclusion

The one-year deadline severely burdens Petitioners Committee's access to the ballot in violation of the First Amendment. Even if the Court disagrees on the burden and instead applies the intermediate burden as the Sixth Circuit in *Thompson* did, the City's only affected interest is in seeing its election laws enforced (apparently any laws, regardless of their reasonableness). In the balance, the Court should conclude that that interest does not outweigh the First Amendment protected ballot access rights that the one-year deadline infringes. But here the Court is only deciding whether Petitioners Committee has stated a claim upon which this Court can grant relief, and thus the City's motion to dismiss must be denied.

Respectfully submitted,

/s/ Terry J. Lodge
Terry J. Lodge, Esq.
316 N. Michigan St., Suite 520
Toledo, OH 43604-5627
(419) 205-7084
tjlodge50@yahoo.com

*Counsel for Plaintiffs*

**Certificate of Service**

I hereby certify that I filed this document in the Court's CM/ECF on February 26, 2021,

which according to its protocols provided a copy to the other parties of record.

/s/ Terry J. Lodge
Terry J. Lodge, Esq.
*Counsel for Plaintiffs*